Good morning, Your Honors. I'd like to request five minutes for a rebuttal at the end to save five minutes. Yes. Try to keep track of your time, and I will try to remind you, but it's your responsibility. I understand, Your Honor. I'd also like to apologize for not being here when the case was first called. That's all right. No problem. You were here and were absent temporarily. Thank you. The original 16-1 mine is here before you today because of the tragic accidental death of an employee, co-worker, and friend, Miner Mark Fussell, on November 6, 2000. All parties agree that Mr. Fussell's death was the unfortunate result of his own negligence. As the Secretary points out, the Mine Act established a system of strict liability, so Mr. Fussell's negligence inevitably resulted in citations against the mine. The 16-1 has contested the citations because some of them are based purely on speculation instead of on trying to understand what caused this tragic accident, and because the Secretary has sought to impose significant liability against the 16-1 based on the imputed negligence of Mr. Fussell's one moment of fatal thoughtlessness that unfortunately resulted in his death. Let's put the imputed negligence claim aside for just a second. The other citations that you're attacking, can you show the panel where in the record you raised that in your PDR? Yes, Your Honor. I was going to address the jurisdictional issue next, which is, I believe, what you're asking about. The Secretary ---- Address it by showing us where in your PDR. The PDR ---- You specifically referred to the other citations. The PDR has two items that are listed in it that I ---- that we rely on here on this appeal. The first one says the record lacks substantial evidence to support the findings. The second one says the allegation that Mark Fussell, a lead miner, has management responsibilities suggested by Petitioner is acting contrary to law and the decisions of the Commission. We concede that the ---- You're talking to putting aside the questions of the agency. Yes. The other citations. Not the ones that relate to his agency. There is nothing more specific in the PDR itself about the substantial evidence point. And we concede that the PDR is not as detailed as it optimally should have been. And we understand that the Court does not have jurisdiction or the well-established case law says the Court does not have jurisdiction to consider an objection that was not specifically raised in front of the Commission. This case, we think we're leaving aside the second issue on the agency, which I would argue is clear enough to give the agency some indication of what's being argued. In this case, we're going to ---- what we rely on is the portion of the jurisdictional statute that allows the Court to hear a case under exceptional circumstances. And the exceptional circumstances that we rely on in this case are the fact that the PDR was combined with a request for extension of time to specifically identify the substantial evidence issues. The ---- it's important to ---- and the PDR points out some of the reasons for that extension of time is consistent with the Commission's published rules that purport to permit extensions of time, particularly Section 2700.9, which says under extensions of time, the time for filing or serving any document may be extended for good cause shown. And it goes on to say that a request for extension of time should be filed three days ahead of the time a document is due, and it could be faxed in. That's what the 1601 did. And they explain some of the reasons in their PDR for requesting an extension of time. The issues that are before you, the substantial evidence issues, were the result of two days, three days of hearings, two days in June of 2003. The ALJ's decision came out on January 5th of 2004, seven months later. The citations to the record are extensive. And, of course, the 1601 didn't know what it was going to challenge until it got the ALJ's decision. That decision happened to come out at a time of year when the 1601, as a small company in a small mine, was just overwhelmed with other issues, including the year-end financial filings, the fact that there was no electricity, they had to get the power back on, the pump went out, all kinds of things that were listed on its website, which are referred to in the PDR, and the Commission is asked to look at those. And in addition to that, the 1601 was looking at a decision by the ALJ that it thought had significant issues, that there were a lot of things that they think the ALJ got wrong. This is not something they could sit down and knock out in an hour. And that's why they requested additional time. Also, the record reflects that the 1601 at this time was technically insolvent. You had two people who were basically working without pay to try to get this done. And as I said, under these circumstances, with the request for extension of time and the record in this case, we ask that you apply the exception for exceptional circumstances. I haven't found a case that's directly on point on something like this, but the cases that are out there interpret that exception according to the plain meaning of the words, something along the lines of good cause or would be fundamentally unfair to the petitioner. And that's what we're talking about here. It's also consistent with both the Act and the Commission's regulations, which encourage participation by minors themselves, which is what the 1601 was doing in this case, and which encourage a decision on the merits and a decision that accurately reflects the causes of an accident so a similar accident can be prevented and so that minds aren't put out of business for things when they didn't do anything wrong. The one Ninth Circuit case I'll mention that talks about exceptional circumstances, or at least the one that I found that I think is closest on point, is NLRB v. STR, Inc. It's Ninth Circuit, 1977, 549F2nd 641-642. It's one of the cases that is referred to in the P.G. Oso case that the Secretary refers to in her brief. I realize it wasn't cited in our brief, but if you read that decision, it refers to exceptions to the rule, and then it leads you on to other cases, and that's where you can find it. That case says a review of the case shows that the extraordinary circumstances provision of Section 10E, a different section but similar language, excusing a losing party's failure to make objection to the board has been applied only in rare cases, as when a snowstorm closes the board's offices or when a telephone and taxi strike prevent delivery of the objections. Before you spend too much time on this, let me ask you just one practical question. The fines totaled about $19,000? Yes. And almost all of them were attributable to the two incidents involving the deceased and his agency? Correct. So we're only – what you're arguing about on the jurisdiction on the others' claims is only a couple hundred dollars, right? Well, not quite, because the – if the Court did not agree with the 16 to 1 on the supporting the second citation, which is some $7,500, claiming that the trammer was defective. Part of the reason the 16 to 1 objects to that is because the fines are a lot for a small company that's struggling. But another important reason for them, and this may sound hokey, but it's true, is because they worked with Mr. Fussell. And for the Secretary to assume that he did something like work with a defective piece of equipment that he knew he wasn't supposed to do and they don't believe he did and the evidence suggests that it wasn't defective that morning is just plain wrong. It's a dishonor to Mr. Fussell, and it doesn't – it doesn't – it shows that the agency, when it inspected this, wasn't looking for the true cause of the accident and was just by rote citing based on speculation and assumption. But I – but you're right. I don't – I don't need to get into that because if the agency issue is addressed and we really think that's the major error. But we could really, for purposes of the argument at least, just ignore the other claims and talk about the two involving Mr. Fussell. And on those, you have at least the agency issue, we'll assume preserved for the moment. And what you're concerned about is that if you lose on the agency issue, you'd like us to review the substantial – the substantiality of the evidence as to the locomotive. Correct. And we actually were – were prepared to withdraw the other claims other than those two citations anyway at this argument. So – so totally agree with that approach. Okay. The only reason those other citations were even mentioned is because they were used to try to show negligence on the part of the mine as to these major citations and because – Well, let's get down then to the agency question. Okay. The agency decision depends on an interpretation and application of – of law in this section. And it's – and it's 30 U.S.C. Section 802E in which agent for purposes of this act is defined as any person charged with responsibility for the operation of all or a part of a coal or other mine or the supervision of the miners in a coal or other mine. I submit that that language is not ambiguous applied to facts like this. And I think the commission agrees because it's well established under the mine law that the negligence of a rank-and-file miner is not imputable to the operator. In this case, it's undisputed that Mark Fussell was a lead miner. The ALJ based its decision that Mr. Fussell should be considered management on two pieces of evidence and one assumption. The piece of – the first piece of evidence was Mr. Miller's opening statement, which the ALJ had previously told Mr. Miller was not going to be considered as evidence. So, I mean, that's just an example of what the mine feels was – was an unfair hearing and an unfair process and an unfair result. The second area that the ALJ relies on is the testimony of the mine manager, Mr. Farrell, in which Mr. Farrell describes the duties of – of Mr. Fussell. I submit that if the Court looks at the ALJ's description of Mr. Fussell's responsibilities, they are no different than the responsibilities of any other ordinary miner. And if those – The problem, it seems to me, is that they said he had one other miner there with him. Correct. And they said that there's always – they're all lead miners. Every one of the mines has that title. But they said that one person's always in charge when there's more than one. And that Mr. Fussell was the one in charge of the other person. That – that's just a reality of everyday work. Whenever you have two people working anywhere, somebody's going to be more senior and somebody's going to have a little bit more to say about the job than not. And previous Commission decisions, like the Marietta Aggregates case, make clear that the responsibility for assigning work or even the responsibility for telling somebody to stop work if it's unsafe does not convert a rank-and-file miner into a supervisory agent. And that's – that is exactly the type of information that the ALJ relied on in this case. There is absolutely no evidence in the record that Mr. Fussell had the responsibility to prepare reports for the mine, to meet with inspectors, to hire and fire, to discipline employees, to do anything else that's associated with management activity. And the words supervision of miners and responsibility for the operation of a mine have to mean something. Miners are responsible for their workplace and for the safety of that workplace. That's necessary for every miner, because no management person can run around and look at every piece of equipment that a miner touches before he touches it. It's impossible. Further, that's consistent with the Act, because the Act itself says that responsibility for fixing unsafe mine conditions is a function of management with the assistance of the individual miners. And that's what – that's what Mr. Fussell's responsibilities were here. If you look at the description of what the ALJ relied on, it is no different than the descriptions in Martin Marietta – in the Marietta Aggregates case where the Court said that's not enough to convert an ordinary miner into management. And if the ALJ's application of the rule here were applied broadly, the – the And in that context, there's one other piece of evidence that the ALJ – Any supervisors at all, or is everybody equal? No, there was a supervisor. Jonathan Farrell was a mine manager. He was on duty that day. He was the supervisor. He assigned the miners their tasks. He was responsible for preparing the safety audits. He testified to that. I can give you citations to the record for that if you'd like. But the evidence is undisputed that he was not a foreman, he was not a superintendent. He reported to Mr. Farrell. Well, what do you do with the testimony, was Mr. Fussell responsible for that area? Yes. Was he responsible for the safety in that area? Yes. Was he responsible for the men in that area? He would be, yes. Because the mine managers explained that every miner is responsible for every other miner. They work as partners. It's like scuba diving or any other hazardous activity. When you go in there with a partner, you're responsible for one another. And every individual miner is responsible for following the safety rules of the workplace. So was the other individual there with him that day? I've forgotten his name. Mr. Coutts, Vince Coutts. Would the answer to the questions have been the same with respect to him? Yes, except for – I don't know if Mr. Fussell had more experience or whatever they – He was senior to the other folks. It's not clear who had a higher pay grade, so it's not totally clear on the record who had more seniority. But one person had, for some reason, had a little bit more to say about the workplace than others. And, again, that's no different than any other work site. There are always senior people. There are always people who have a little bit more to say about the job than the other person they're working with. But that doesn't make them supervisors. And I suggest if that were the standard, it would be counterproductive to what the Act is, because then it would expose the mine to risk whenever it allowed one person to supervise or give experience to the other people he was working with. And that's – I mean, that's the case. That's what you want. You want experienced people to help less experienced people to point things out. But just because they do that doesn't make them responsible for the mine, and it doesn't make them managers. And it's not a fair basis to impute liability to the management, to the mine, if one person does something wrong. Kennedy. I just had a quick question. If this cannot be answered by reference to the record, just tell me so, and we'll shove it aside. Would the determination that Fussell, the miner who died, have any impact, that he was negligent, have any impact on his ability, his family's ability, survivor's ability to collect out of the circumstance of his death? That information is not available in the record. I don't believe any family member has made a claim. I mean, I know that no family member has made a claim, and my understanding is that they're all satisfied with the mine's explanation of what happened. Okay. But there is nothing. I'm going outside the record to tell you that there's nothing in the record that responds to that. This is a matter of law. You obviously practice in this area. Would that determination have any impact on a – in any circumstance like this, on a civil suit by someone killed or injured in the course of duty? I'm sorry. I honestly can't answer that question. I don't really practice in this area as a regular course, and I can't give you an honest answer. That's fine. Thank you very much. We'll give you five minutes for rebuttal. Thank you. Good morning, Your Honors. My name is Cheryl Berkiewski, and I'm representing the Secretary of Labor. Your Honors, this matter does not belong in this Court. You have no jurisdiction to hear this case. This is so – It's not a very happy story. We like to hear cases. I know, Your Honor. But the Secretary submits that. The Secretary is really taking a very hard attitude about this whole case. I mean, these people had a tiny operation. They got their complaint in on time. They asked for an extension. The Secretary writes a letter as if they're, you know, dealing with the most egregious criminals in the country, and they say, oh, under no circumstances should we give them time to write a decent complaint. Not only we gave them time in another case, and then we ruled against them, and then, furthermore, we don't have any authority to extend the time for complaints under the law. Is that really true, that the people must, no matter what, always file on time? No, Your Honor. No, Your Honor. Isn't that what your letter says? But, Your Honor, we've been very lenient with this. Why did you say that the statute prevents you from giving them an extension of time? Your Honor, they got the extensions of time that they required. What do you mean? They sent in a letter on February 2nd and asked for 45 to 60 days. The Department replied and said, you know, why should they, just because they're a small mine going through all these problems and they don't have a lawyer, why should we give them time to file an adequate complaint? And, furthermore, that was in February 10th, he said that. Furthermore, we don't have the authority to extend the time, although they'd actually filed their basic statement. They just wanted time to give you the reasons that we now say prevent us from finding jurisdiction. He said you don't want to give them time. And then a few days later, you denied their case. Your Honor, that's the commission's doing. We — Well, that's right. And then you tell them at the hearing, go ahead and make an opening statement. We're not going to consider what you say. That's irrelevant. Just go ahead and tell us what you think, and then you rely on that as the basis for the decision. Your Honor, that's not accurate. Mr. Miller started making his — when he was making his opening statement, he was stopped by the ALJ, who told him that he was, in fact, testifying and that he should stop. He should stop? He should stop testifying until they came to that stage in the — in the case. He was just supposed to make — the ALJ gave him permission to make a very short opening statement, and he said it was going to be a short opening statement. Halfway through, when it was realized that he was, in fact, giving testimony, the judge stopped him and cautioned him and said, Mr. Miller, do you realize that you're testifying here? Would you like to continue this? He hadn't been sworn in at this stage. And he said, I'd like to finish what I was saying, which he did. But, Your Honor, all the evidence that Mr. Miller, quote, unquote, gave in his opening statement was corroborated later on by both Mr. Miller and the mine manager. It may have been, but certainly the ALJ relied on it very heavily in this decision. Your Honor, you seem to be penalizing the Secretary because the mine chose not to have an attorney. That was their choosing. And it seems like — You know, people may choose not to eat or have homes either or to be homeless. Maybe they choose that. This is a very small business with very little money that's not even operating. Your Honor, the — I don't think they chose not to have an attorney. They did their best to file a complaint, and they wanted more time to try to fill it out. Maybe they would have gotten an attorney. Well, Your Honor, they eventually did. And this operation is not that small, Your Honor. They had a million and a half dollars' worth of gold, plus gold nuggets, that was appraised at $44,000 at the time of the hearing. They had a lot of money sitting there. This was not a poor operation at all. All right. Let's go back to the opening statement. First he tells him, that doesn't count, just say what you want. Then he gives his name, and he gets sworn in. He starts to make his opening statement. It's half a page when the court starts to ask him questions in the middle of his opening statement. The court asks him questions. He keeps answering the questions. And it's a cross-examination by the court about his opening statement, in which the evidence in the middle of his opening statement goes on for a couple of pages by the court questioning him. And then after a couple of pages of questions by the court, then is when the court says, excuse me, I don't mean to interrupt you, but then if you're going to testify, then I will be able to consider it as evidence. I don't want to cut you off if you want to present that as opening argument. That's when he says, go ahead and present it. And he says, you can reserve that testimony, and then he goes on. But it's all the statements before then, which are in response to questions by the court when he's trying to make an opening statement, that the ALJ then relies on. Your Honor. Don't you think that's a due process violation? Your Honor, it would be if the ALJ, in fact, relied only on that. But all the evidence is corroborated later on during the testimony by both Mr. Miller, the President and CEO, and Mr. Farrell, the mine manager. Your Honor, I also would like to explain why I think this Court has no jurisdiction a little bit more. When the commission was served with the PDR by this company, it failed to urge any objections that the ALJ had made any mistakes. It's statutorily required that certain things must be in a PDR. And this is attached to every single decision that an ALJ puts out, whether it's a one-person mine or a huge conglomerate. With every decision, there's a cover sheet that cautions litigants what they need to do. And in this case, it tells you two things in particular. It says that if, after 30 days, a commission does not choose whatever their requirements are. So listen to this case. After the 40th day, this decision by an ALJ becomes a final decision by the commission. And it's then appealable to a court of appeals. It also reminds litigants that they need to do something very quickly, and it tells them there must state with some semblance of specificity what a PDR must contain. 1621 had nothing in its PDR that required this. It certainly is fine for the secretary to be lenient, but this is taking leniency to an extreme. There was nothing in this PDR that even articulated what 1621 objected to. There was no argumentation that said this is what we object, and they sort of regurgitated some sections from the Act, again, without any argumentation. And so, Your Honor, I figure that this, you know, the commission didn't listen to this case for a reason. They had nothing to go on. Well, that brings me back to your letter of the Department telling the commission that it didn't have the authority to give them time to specify the reasons. Now, the Department did tell that to the commission, and the commission then immediately issued a decision without giving them time to amend their PDR. Isn't that right? That's not correct, Your Honor. It's not correct. Your Honor, the commission is an independent body from the Secretary of Labor, and they make their own decisions. They made a decision based on the statement by the commission that they did not have the authority. Just the way you're telling us, we don't have jurisdiction. The department told the commission it did not have authority to extend the time to get to allow them to make the showing that you now object to, that they're failure to make. Isn't that right? Didn't they tell that? Yes, Your Honor, because statutorily, there's this 30-day window that the commission could allow a litigant to have. And above and beyond that, it's they just don't have the authority. To let them supplement the PDR with specific reasons. Well, Your Honor, had this sent in a letter, the commission would not, and I'm not a member of the commission, and I don't know exactly what they use to make their Especially since it was a pro se. They were still pro se at that level. Had submitted something to the commission that said, this is why this is coming in late. I mean, the commission has had instances like that before where they accept amendments to PDR, but this wasn't the case. Why did the secretary tell the commission that it had no authority to grant this  extension? Because that was the fact. We weren't making up these facts. But he said that they have, in the past, allowed people to supplement their initial statements. That's true. And that's all they asked for. They asked for permission to supplement their initial statement, to give the reasons. And the department told the commission it didn't have authority to grant that extension. Because, Your Honor, that's what the law says. You just told us that you've done it in the past. But, Your Honor, that's not the secretary's call. That's the commission's call to make So the commission's done it illegally in the past? It's not illegal. It's not. They do have the authority to do it. I would imagine, Your Honor, the answer to that question would be yes. Yes. They have, in fact, done it in the past. And then the secretary misrepresented their authority in its letter opposing the extension, right? The secretary misrepresented the commission's authority when it said to them, the statutory time limits are mandatory and jurisdictional. The law is well established. The court has no authority to extend the time limit. And it goes on for the whole paragraph. Accordingly, the commission has no authority to extend the time for filing a petition for discretionary review. Your Honor, that is true. The law is clear. We think that the law could say this is what happens. But, Your Honor, I regret that I don't have the name of a case, for example, where this was extended by the commission to give to you. But in this ---- But the problem with the secretary's position is they weren't seeking an extension to file a petition. They were seeking time to supplement the petition. They filed the petition timely. They asked for permission to give the reasons that you now tell us we can't, we don't have jurisdiction because they didn't give the reasons. They asked for time to give the reasons, and the secretary told the commission it had no authority to grant that time, and, in fact, it did. Yes, but, Your Honor, they had 30 days to submit something to the commission. And that's what every other litigant gets, whether it's the secretary or a big coal mine or a gold mine or a one-person operation. We have these 30 days in which we were obligated to respond to or file something with the commission. Okay. All right. Your Honor, I'd like to, if I may, talk a little bit about the agency issue. In this case, I think the Petitioner was simply wrong in claiming that this gentleman was not — Is every lead miner an agent? No, not at all, Your Honor. What made him different from all the others? Several things, Your Honor. First of all, prior to this real tragic accident on this particular day in September, this gentleman had apparently been working on this new level of a mine. Apparently, the gold mine was then limited to an 800 level. He, by himself, had one month prior to that been assigned to work on the 1700 level. And on the day of the accident, he was assigned a helper. Mr. Cutts had been sent up there to help him complete this task. They were apparently getting this 1700 level ready for mining. They were, I guess, moving the operation up to the 1700 level. So, Your Honor, he was designated a lead miner, and that's undisputed by both Mr. Miller and the mine manager. Everybody's designated a lead miner. Every employee, right? Right. Mr. Miller claimed that there were no regular miners at this company. Apparently, you're a regular miner when you start. As you get the experience, you become a miner one, and then subsequently a miner two, and then a lead miner. Every employee. On that day was a lead miner. But this deceased was a little different in that he had had the experience of working in this area prior to this, the events of this tragic day. How does experience turn him into a manager? Because case precedent and the Mine Act talk about function rather than the title. And in this case, he had, in fact, been doing the functions of a supervisor. When the two lead miners had been working at this spot, Mr. Fussell and Mr. Cutts, it is undisputed that Mr. Fussell was, in fact, in charge. He was the one who ---- If Mr. Cutts hadn't been there, would he then have been a supervisor? If one could be held to supervise oneself, I ---- That's the question. The only reason, if Mr. Cutts hadn't been there that day, as he wasn't most days, then Mr. Fussell wouldn't have been an agent. Well, they said he was responsible for the area. He was responsible for everything in the area, including the safety. And they say every miner is responsible for his own area. But, Your Honor, every miner was not killed doing their job. But every miner who does get killed is an agent because he's responsible for his area. Well, not if, according to their argument, not if the other lead miner or whomever else was, in fact, working with him, was, in fact, more senior. And this guy, you had asked the question earlier whether he was more senior. There's evidence in the record that says he was, in fact, very senior. He had gotten more. He was paid more. He had more experience. It worked for the mine longer. Excuse me, Your Honor? It worked for the mine for a longer period of time. That's true, Your Honor. And the fact that he was who? Could you give the panel an example of a lead miner who, working alone, would not be a supervisor? A lead miner working alone? You've told us that a lead miner working alone could be his own supervisor. If that were determined by his bosses, in this particular case, Mr. Farrell had sent Mr. Kutz to help Mr. Fussell complete a job on a slusher, and in that case, Mr. Fussell We're talking about this case. Give us an example of a miner who is a lead miner working alone who would not qualify as an agent. Your Honor, I'm not sure. Probably in the case where somebody more senior than the company would have given permission and said, today you are functioning as a lead miner or as an agent. For example, if a supervisory person or a mine manager had to leave the premises, the next in line, and generally it's designated, it has to be pointed out by a senior person that you're in fact in charge, when I'm no longer around or I'm indisposed. That's the sort of thing that we see in case precedents that say, today, for example, or this week or this month, you're an agent and you're representing this company because of the functions you're carrying out. You're going to close up the place. You're going to be working up here by yourself. But it's always designated by somebody more senior who tells this, quote-unquote, agent that he's in fact doing the job of a supervisor or doing the job of an agent of the company today. All right. Thank you, counsel. I'm going to see if you have a closing statement. Your Honor, the Secretary submits that this was indeed a really tragic accident, and it's obvious that this mine, although not that small of an operation, was sort of living the American way. They were trying to do the best they could. But the Mine Act says that when an accident happens or something goes wrong, the actions of somebody like Mr. Fusil is imputed to the operator. And when you send a miner into an operation with equipment that's defective or you don't teach people the proper way to do stuff, especially in light of what's happening in mines nowadays, the operator has got to be responsible. And in this case, this operator is trying to not be responsible for something that went terribly wrong. And in this case, you know, the Secretary of Labor submits that had the equipment not been defective and had circumstances that would have been different. Of course, those are not the circumstances of this case. We find the facts as we see them. This would have been a completely different case. But somebody died. And it's tragic that it happened, but that's, in fact, the way it happened. Thank you, Counsel. Thank you. Your Honors, I'd like to very quickly follow up on some of the questions that I think you asked and some of the responses that were given. First off, I want to correct something. The Secretary – I'm sorry. I don't know how to pronounce her last name. I really apologize. But she said that there are $1.5 million in gold assets for the 16-to-1. Those assets were all pledged for liabilities. There were no net assets for the 16-to-1, and that's testified to. Secondly, there's testimony that there was – or there was a statement that Mr. Fussell had worked at the 1700 level of the mine alone, and that somehow distinguished him from a lead miner. That's absolutely not true. It's not supported by the record. No one at the 16-to-1 ever works alone. They're always assigned partners, and the work records show that he was assigned partners. There's questions that Mr. Fussell was somehow unusual as a lead miner. Look at the transcript at sections 372 to 375, where the work records describe what Mr. Fussell actually did the two weeks before this accident. He painted railings. He cleaned debris. He set up the slusher. This is all things that any other miner would do. There was nothing exceptional there. And this case is different than all of the other cases where there was evidence where a miner was turned into an agent. This is not a case where somebody delegated decision-making responsibilities or delegated reporting responsibilities to Mr. Fussell. There's absolutely no evidence in the record to support that. I'd also want to suggest that in all of those cases that the Secretary cites, and that's the Rochester and Pittsburgh Coal, All-American Asphalt, Ambrosia, in all of those cases where a miner was deemed an agent, the violation, the citation issue, arose directly out of the management responsibilities that the miner was doing. In other words, the miner was assigned to go out and meet with inspectors, or the miner was assigned to do weekly inspection reports. And his fraud in committing those reports was the basis of the violation. What the Secretary is trying to do here is say that this miner qualifies as management because he had responsibility for his workplace. And then the ALJ goes on to make the inference, or really it's the speculative assumption, that this miner filled out weekly work reports, and that made him different. First of all, the evidence in the record totally doesn't support that he filled out any weekly work reports. Nobody asked him that question. It's absolutely not in the record, and it's contrary to the testimony of Mr. Farrell, who said he does the weekly work reports. Second of all, this accident didn't come about because he filled out a safety report. This accident came about because he had a moment of thoughtlessness. He did two things that were bad and that were negligent. First, he drove the trammer under the chute instead of cutting off the chute first, as he was assigned to do. Maybe a little bit of impatience. Then, like so many accidents, he made a second minor mistake, something that happens very frequently. He backed up without looking. And you can look at cars on the road, look at the number of dents in the rear bumper, how often that happens. Unfortunately, he did two wrong things, and they created a fatal accident for him. But that's all it was. It was an accident, and it was an accident he committed in his role as an ordinary minor. If Mr. Coutts had been driving that train, he would have been responsible for the same types of safety checks that Mr. Fussell is being charged with doing. He would have had to look at the trammer. He would have had to cut off the chute first. There's nothing different about Mr. Fussell than any other minor that works at the 16 to 1. And I'd like to point out, I really want to point this out, because the secretary's brief wishfully describes as an inference that he filled out those weekly reports. The transcript section there is Section 368 to 376, which describes Mr. Farrell's responsibilities in filling out those reports, and which also describes that the 16 to 1 has a procedure that requires every minor to check off, when he gets to the workplace, if there was anything found defective there. Every single minor, from the very, very most junior there to the very most senior there, everyone has to do that. And that's just the safety policy of the 16 to 1. If you convert that kind of a safety policy into management and into imputed liability, that's contrary to the purposes of the Act, and it just makes no sense. Now, Mr. Cole, when did you get involved in the case? I got involved in the case. I think I filed the statement here shortly before Christmas, December of 2005, and I got involved after Mr. Gilmore unfortunately died in a traffic accident, leaving the 16 to 1 mine going to dinner. Did they have no lawyer up to that point? I'm sorry? Did they have no lawyer? I would think any business would have some lawyer they turned to, but they had no lawyer? They had no lawyer at this time, and I can tell you that the 16 to 1 cannot afford to pay a lawyer to this day. This is a case where people are coming in to help the mine, and that's what Mr. Gilmore did, and that's what I'm doing. Where is it located? It's in Allegheny in Sierra County. It's about an hour north of Nevada City. Mr. Gilmore is not a lawyer? Mr. Gilmore was a lawyer. He unfortunately is deceased. And when did he come in? I can't answer that question exactly when he started helping the 16 to 1. I believe it was at some point after the 16 to 1 was charged with criminal violations after this accident. But I don't know exactly when. I'm sorry. I think our time is up. It is. I'm sorry. Thank you very much for your time. Thank you, counsel. Case just argued will be submitted to the court.
judges: Reinhardt, Noonan, Hawkins